UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA,

v.                                                    Index No.: 18 Cr. 499 (LAK)

MIDENCE OQUELI MARTINEZ TURCIOS

**POST-HEARING BRIEF ON BEHALF OF DEFENDANT MIDENCE OQUELI
MARTINEZ TURCIOS**

**GELBER & SANTILLO PLLC**

Kristen M. Santillo, Esq.
Sarah A. Sulkowski, Esq.
52 Duane Street, 7th Floor
New York, NY 10007
(212) 227-4743
Ksantillo@GelberSantillo.com

*Attorneys for Defendant Midence Oqueli
Martinez Turcios*

## <u>TABLE OF CONTENTS</u>

**Page**

I.    Legal Standards ................................................................................................1

II.   The Disputed Factual Allegations Regarding Violence, Including Murders and
      Torture ...........................................................................................................1

      a.   Rivera lied under oath at the *Fatico* hearing and to the Government in prior
           proffers ...................................................................................................5

      b.   The Government failed to establish by a preponderance of evidence that
           Martinez engaged in the violent acts alleged in the draft PSR ............................7

           i.    Alleged Victim-1, Coqui Ramos ..................................................7

           ii.   Alleged Victim-2, Juan Roman Salgado ........................................9

           iii.  Alleged Victim-3, Nahum Palacios, and Alleged Victim-4, his
                 partner ...............................................................................12

           iv.   Alleged Victim-5, "Mantequilla" .................................................17

           v.    Alleged Victim-6, Salvador Regalado ..........................................19

           vi.   Alleged Victim-7, "Alex" ...........................................................20

      c.   The previous proceedings in which Rivera testified, and upon which the
           Government relies, do not add weight to Rivera's testimony before this
           Court, and in fact undercut his credibility .........................................21

III.  The Undisputed and Disputed Facts Related to Drug Trafficking ............................23

IV.   Conclusion ................................................................................................25

i

## <u>TABLE OF AUTHORITIES</u>

**CASE**                                                                    **PAGE(S)**

*United States v. Archer*,
    671 F.3d 149 (2d Cir. 2011) ........................................................................1

*United States v. Autuori*,
    212 F.3d 105, 120-21 (2d Cir. 2000) .....................................................19,20

*United States v. Bonilla Valladares*,
    No. 15-cr-379 (PKC), ECF No. 551, at 1-2 ................................................9

*United States v. Desimone*,
    119 F.3d 217 (2d Cir. 1997) ........................................................................1

*United States v. Fuentes Ramirez*,
    No. 15-cr-379 (S.D.N.Y.), ECF No. 290, at 349-51 ...........................*passim*

*United States v. Fuentes Ramirez*,
    No. 15 Cr. 379 (PKC) (S.D.N.Y.) ...............................................................16

*United States v. Hernandez Alvarado*,
    No. 15 Cr. 379 (S.D.N.Y.), ECF No. 113, at 1194:20 – 1195:10 ..................22

*United States v. Hernandez*,
    No. 15 Cr. 379 (S.D.N.Y.), ECF No. 758, at 1677:3 – 1679:21 ...............22,24

*United States v. Jordano*,
    521 F.2d 695 (2d Cir. 1975) .................................................................19,20

*United States v. Juwa*,
    508 F.3d 694 (2d Cir. 2007) ........................................................................1

*United States v. Lobo*,
    No. 15 Cr. 174 (S.D.N.Y.), ECF No. 211, at 3-5 ..............................*passim*

*United States v. Myton*,
    No. 98-CR-500 (S-4) (FB), 2005 WL 1397208 (E.D.N.Y. June 14, 2005) ......6

*United States v. Najera*,
    2022 WL 2802703, at *11 (S.D.N.Y. July 15, 2022) ....................................21

*United States v. Seijo*,
    514 F.2d 1357 (2d Cir. 1975) ......................................................................6

*United States v. Williams*,
    247 F.3d 353 (2d Cir. 2001) ............................................................................1

*Vail v. Walker*,
    No. 96-CV-578 (FJS/DRH), 1997 WL 695583 (N.D.N.Y. Nov. 4, 1997) ........................6

**STATUTES**

U.S.S.G. § 6A1.3 ..............................................................................................1,4

On behalf of defendant Midence Oqueli Martinez Turcios, we write to address the issues that remain in dispute following the *Fatico* hearing before this Court on December 12, 2024 and December 16, 2024, and to provide the Court with additional documents and information, including affidavits from Honduran witnesses who have come forward to offer their support for Martinez and to refute the allegations made against him by Leonel Rivera since news reports about Rivera's testimony at the *Fatico* hearing were widely reported by the Honduran press.

## I.     Legal Standards

At sentencing, the Government bears the burden of proving contested facts by a preponderance of the evidence. *United States v. Archer*, 671 F.3d 149, 161 (2d Cir. 2011); *United States v. Williams*, 247 F.3d 353, 358 n.7 (2d Cir. 2001); *United States v. Desimone*, 119 F.3d 217, 228 (2d Cir. 1997). Although the rules of evidence are not applied strictly at the sentencing, the Second Circuit has made clear that "there are distinct limits to [the sentencing court's] discretion, and they include a defendant's due process right to be sentenced based on accurate information." *United States v. Juwa*, 508 F.3d 694, 700-01 (2d Cir. 2007). *See also* U.S.S.G. § 6A1.3 ("In resolving any dispute concerning a factor important to the sentencing determination, the court may consider relevant information without regard to its admissibility under the rules of evidence applicable at trial, *provided that the information has sufficient indicia of reliability to support its probable accuracy*.") (emphasis added); U.S.S.G. § 6A1.3 cmt. 1 ("Unreliable allegations shall not be considered.").

## II.    The Disputed Factual Allegations Regarding Violence, Including Murders and Torture

In his plea agreement, Martinez reserved the right to dispute, and he continues to vigorously deny, allegations that he solicited or participated in any acts of violence, including the

graphic and serious allegations of murder, kidnapping and torture contained in the draft Presentence Report ("PSR"). *See* PSR ¶¶ 23-31.

In sharp contrast to the gravity of these allegations, the Government has offered only the ever-shifting word of one man: Leonel Rivera, a confessed serial killer and leader of one of the largest drug trafficking organizations in Honduras, to corroborate them. But Rivera is one of the rare criminal defendants who has nothing to lose and everything to gain from implicating both himself and others in the most serious of conduct, even murders and torture. The quantities of drugs he trafficked and the weapons he possessed assure that he will spend the rest of his life in prison unless he is able to testify against as many defendants as possible to gain credit for his cooperation. This includes Midence Martinez, whom Rivera claims to view as family although they are only distant cousins.[1]

As detailed below, during the *Fatico* hearing, Rivera lied under oath and acknowledged that he misled prosecutors in prior proffers. He further alleged that Martinez engaged in conduct that materially differed from that alleged in the draft PSR in numerous respects, including raising new allegations not included anywhere in the draft PSR, and wholly failing to support still other serious allegations that do appear in the draft PSR. Rivera also gave testimony that conflicted with his prior sworn testimony in other proceedings, and was even gave internally inconsistent testimony during the *Fatico* hearing itself. In light of these factors, Rivera's testimony—the ***only*** testimony that Martinez ever engaged in violence—simply is not credible, and we respectfully urge the Court to reject it.

---

[1] Notably, Rivera has acknowledged that he has murdered at least one of his family members. *See* 12/12/24 Hr'g Tr., ECF No. 45, at 71:20 – 72:2.

2

While the Government contends that publicly available news articles corroborate Rivera's testimony, in fact they do no such thing. Indeed, Rivera's jail calls and testimony show that he was consulting the internet himself when preparing to proffer and testify, and that he urged his brother to do so as well, undercutting any notion that details he could have gleaned from the press corroborate his testimony. *See, e.g.,* DX 2 (Call Transcript) at 1 ("Look it [the name of the club] up on the Internet. . . . No, it was a disco. . . . It says there on the Internet. . . . It was a disco. . . . That was in 2013."). In any event, while the cited articles may establish that murders occurred, the scant details contained in the articles do nothing to establish that ***Martinez*** participated in them. Indeed, in some cases—as noted below in connection with the alleged murder of Nahum Palacios—numerous publicly available articles ***contradict*** Rivera's testimony.

Since the *Fatico* hearing, details of the specific allegations against Martinez have also emerged in the Honduran press, many for the first time.[2] Multiple Honduran witnesses who have seen these accounts have come forward, providing the defense with sworn affidavits refuting Rivera's allegations. We urge the Court to consider these affidavits from witnesses with personal knowledge of Martinez and of the events in question, as they materially contradict Rivera's testimony—which is, again, the only evidence the Government has proffered that Martinez engaged in violence—providing a powerful counterweight to Rivera's uncorroborated allegations.[3] *See* 12/16/24 Hr'g Tr., ECF No. 47, at 134-135 (permitting the defense to present

---

[2] *See, e.g.*, Contexto, *Midence Oqueli Accepts Being a Narco, But That He Did Not Kill or Torture Anyone* (Dec. 16, 2024), *available at* https://contextohn.com/nacional/midence-oqueli-acepta-ser-narco-pero-que-no-mato-ni-torturo-a-nadie/; Once Noticias, *"El Cachiro Was There": Hearing of Former Deputy Midence Oqueli in the United States* (Dec. 12, 2024), *available at* https://www.oncenoticias.hn/internacional/audiencia-midence-oqueli-estados-unidos-el-cachiro/.

[3] Pursuant to this Court's individual rules, by separate motion, the defense will move to offer the witness affidavits with redactions to protect the identity and safety interests of these witnesses. The Riveras have confessed to killing numerous witnesses who have acted against or spoken

additional information from Honduras); U.S.S.G. § 6A1.3(a) ("When any factor important to the sentencing determination is reasonably in dispute, the parties shall be given an adequate opportunity to present information to the court regarding that factor."); U.S.S.G. § 6A1.3 cmt. ("Although lengthy sentencing hearings seldom should be necessary, disputes about sentencing factors must be resolved with care . . . . Written statements of counsel **or affidavits of witnesses may be adequate under many circumstances**.") (emphasis added).[4]

The Government has also urged the Court to consider, in weighing Rivera's credibility, that other courts have credited Rivera's testimony in other cases. But, as detailed below, there was far more evidence against each of those other defendants, which the Government used to bolster Rivera's credibility in those cases. Here, in contrast, there is **no** other evidence or testimony that Martinez engaged in violence. In any event, Rivera's testimony in those other sworn proceedings was materially inconsistent in multiple ways with the testimony he gave under oath before this Court, which further undercuts Rivera's allegations against Martinez here.

Because the Government has fallen far short of meeting its burden of proving by a preponderance of the evidence that Martinez committed any acts of violence, we urge the Court to reject all allegations of violence against Martinez in the draft PSR (at ¶¶ 24-31) and sentence Martinez without considering those allegations.

---

against their interests, and these witnesses fear for their safety if their names are revealed publicly, and especially to any members of the *Cachiros*. In this brief, the defense will refer to these witnesses as Defense Witness 1-7 to protect the safety and confidentially of these witnesses.

[4] Should the Court wish to hear live testimony from these witnesses, we respectfully urge the Court to set an additional date for a Fatico hearing to hear their testimony. Martinez, who is indigent and was appointed counsel under the Criminal Justice Act, must arrange for these witnesses' travel to the United States from Honduras under the procedures established by the CJA, which will require the Court's approval.

### a. Rivera lied under oath at the *Fatico* hearing and to the Government in prior proffers

At the *Fatico* hearing, Rivera demonstrated a willingness to provide specific details, under oath, that were demonstrably false. On cross-examination, for example, Rivera initially testified that, since he has been confined in the United States, the only communications he has had with his brother Javier (his fellow cooperator and partner in the *Cachiros* drug-trafficking organization) were a few questions to their mother about Javier's well-being. *See* 12/12/24 Hr'g Tr. at 78:18 – 78:22 ("Well, through my mom. I've said: Mom, you know, how's my brother doing? Is he OK? Just things like that. That's all."); *id.* at 79:7 – 79:9 ("Yes. It was through my mom. You know, I would tell her to say hi, how are you doing, I hope everything is well with you. That, counselor.").

When asked directly whether he had ever been asked to pass information to his brother about the cases in which they were both cooperating, Rivera answered, "No, counselor. I don't remember." *Id.* at 78:23 – 78:25; *see also id.* at 79:1 – 79:13 (Rivera testifying that the Government had asked him whether he had provided information to his brother and that he had responded by telling the Government that he had merely inquired after Javier's well-being and did not remember saying anything else). After defense counsel refreshed Rivera's recollection with an agent's proffer notes from January 28, 2021 at 3501-134, Rivera "remembered I told my brother to tell [the Government] the truth about what he remembered." 12/16/24 Hr'g Tr., ECF No. 47, at 114:18 – 115:16.

A recording of his own jail telephone calls, however, shows that Rivera's proffer statement and sworn testimony to this Court were false. Defense Exhibit ("DX") 1 comprises the recording and transcript of a January 20, 2021, call—made only a week before the proffer in which Rivera assured the Government he'd merely told Javier to "tell the truth"—during which Rivera provided his wife with substantive information to give Javier in connection with Javier's proffers relating

to another Honduran defendant, Geovanny Fuentes Ramirez, who stood trial in March 2021. 12/16/24 Hr'g Tr. at 115:17 – 117:14; *see also* DX 1 (Call Transcript) at 1 (listing people Ramriez had allegedly bribed); *id.* ("I don't know the name but tell him that Geovanny, Metro and Avila killed that man. That he remembers, tell him that they took him there where he had the cattle. To that farm. They burned him and everything, tell him."). Similarly, DX 2 is a recording and transcript of a January 26, 2021 jail telephone call—made only two days before the proffer at issue—during which Rivera provided his wife with details for Javier concerning the location and date of another alleged killing. *See* DX 2 (Call Transcript) at 1 ("Look it [the name of the club] up on the Internet. . . . No, it was a disco. . . . It says there on the Internet. . . . It was a disco. . . . That was in 2013."); *see also* 12/16/24 Hr'g Tr. at 117:15 – 119:20 (Rivera admitting on cross-examination that he provided dates and details to be given to Javier and instructed that Javier should look up additional details on the internet). The information Rivera provided to his brother was the subject of critical testimony by Rivera at Fuentes Ramirez's trial. *See United States v. Fuentes Ramirez*, No. 15-cr-379 (S.D.N.Y.), ECF No. 290, at 349-51 (describing murder of victims whose bodies were burned), 547-48 (confirming that that account was of the murder of the killers of Metro's brother, as described in the January 20, 2021 call).

In short, Rivera's testimony at the *Fatico* hearing shows that he actively misled the Government about his communications with his brother and then perjured himself before this Court concerning the same matter. "[E]ven when it involves a collateral issue, perjury bears upon the witness's credibility." *United States v. Myton*, No. 98-CR-500 (S-4) (FB), 2005 WL 1397208, at *5 (E.D.N.Y. June 14, 2005); *see also United States v. Seijo*, 514 F.2d 1357, 1363 (2d Cir. 1975) (perjury "has a different and more serious bearing" on a witness's credibility than does evidence of past drug use or criminal activity); *Vail v. Walker*, No. 96-CV-578 (FJS/DRH), 1997 WL

695583, at *7 (N.D.N.Y. Nov. 4, 1997) ("Offering perjured testimony unquestionably undermines the credibility of a witness as to matters beyond the narrow confines of the perjurious answers.").

This evidence further shows that Rivera was relying on third parties and the internet to gather information to bolster his and his brother's testimony about other defendants in related cases. This is particularly troubling because Rivera also admittedly possessed a contraband cell phone for weeks inside the jail while awaiting testimony in this and other hearings; that phone could have also been used to research topics of his potential testimony online and communicate with outside parties to implicate other defendants, including Martinez. *See* 12/16/24 Hr'g Tr. at 112:9 – 113:5 (Rivera's testimony that he had the cell phone for approximately 20 days in jail).

**b. The Government failed to establish by a preponderance of the evidence that Martinez engaged in the violent acts alleged in the draft PSR**

Rivera's testimony also fell far short of meeting the Government's burden to prove by a preponderance of the evidence that Martinez engaged in violence, including murders and torture.

### i. Alleged Victim-1, Coqui Ramos

Paragraph 24 of the draft PSR alleges that:

MARTINEZ TURCIOS agreed to obtain weapons for the *Cachiros* and to train their *sicarios* to kill Victim-1. MARTINEZ TURCIOS also agreed to provide information regarding the planned movements of the Honduran military so that *Cachiros* members and their selected *sicarios* could evade detection and arrest while attempting to murder Victim-1.

Rivera's testimony did not bear out these allegations. First, the Government introduced no evidence that Martinez ever offered the Cachiros any Honduran government or military information to assist in the murder of Ramos. *See* 12/12/24 Hr'g Tr. at 23-27 (Rivera testifying about the Ramos murder but making no mention of Martinez agreeing to provide, much less actually providing, any government or military information).

7

Further, the Government presented no evidence that Martinez "agreed to obtain weapons for the Cachiros and to train their sicarios to kill Victim-1." Draft PSR ¶ 24. In fact, Rivera *disavowed* any intention for Martinez to arm or train the Cachiros' MS-13 assassins to kill Ramos: "Counselor, we hired MS-13 because they were assassins, they were murderers. . . . we really turned to them. My cousin Midence trained them on *how to receive cocaine loads. He trained them how to act on the landing strip so they could receive the cocaine loads*." 12/12/24 Hr'g Tr. at 82:13 – 82:21 (emphasis added). When specifically questioned by defense counsel as to whether he claimed Mr. Martinez had helped to train MS-13 sicarios to kill Ramos, Rivera responded: "He would train them *in personal defense and all of that*, counselor." *Id.* at 82:22 – 82:25 (emphasis added). The allegations that Martinez obtained weapons to kill Ramos, trained sicarios to do so, and provided the Riveras with military information to assist in killing Ramos should thus be struck from the PSR and disregarded by the Court at sentencing.

Paragraph 25 of the PSR alleges that in 2004:

> MARTINEZ TURCIOS provided Leonel and Javier Maradiaga with information about Victim-1's whereabouts, specifically, that Victim-1 was at a particular hotel in San Pedro Sula, Cortes, Honduras. *MARTINEZ TURCIOS's* **sicarios** traveled to this hotel, where they located and shot Victim-1, along with Victim-1's female companion. Victim-1 and his companion survived.

Draft PSR ¶ 25 (emphasis added).

At the *Fatico* hearing, Rivera did *not* testify that "Martinez's sicarios" traveled to the hotel and shot Ramos. Rivera testified only that "[t]here were several groups" of sicarios at his disposal and that the attack on Ramos was carried out by "[s]ome hitmen" including Rivera's father-in-law, Andres. 12/16/24 Hr'g Tr. at 125:19 – 126:7. Accordingly, this unsupported allegation should be struck.

Rivera also testified that Martinez was one among many people who provided information about Ramos's location, including Rivera's other cousins, Ruben Santos and Ovando Martinez, and a bodyguard named Lucas. *See* 12/16/24 Hr'g Tr. at 121:2 – 124:24. Given Rivera's lack of credibility, and his history of confusing Martinez with his brother Ovando, discussed further below, this testimony, which is wholly uncorroborated, falls far short of establishing by a preponderance of the evidence that Martinez had any involvement in an attempted murder of Ramos.[5]

### ii. Alleged Victim-2, Juan Ramon Salgado

Paragraph 27 of the draft PSR alleges that alleged "Victim-2" Juan Ramon Salgado

> . . . was supposed to ensure that MARTINEZ TURCIOS would be appointed to the position of Minister of Security in Honduras. Ultimately, Victim-2 failed to deliver on the appointment as promised. ***As a result, MARTINEZ TURCIOS plotted with Leonel Maradiaga to murder Victim-2. In early May 2006, MARTINEZ TURCIOS and a group of* sicarios *traveled to Victim-2's home in Colon. MARTINEZ TURCIOS and the* sicarios *shot Victim-2, who later died from his gunshot wounds.***

Draft PSR ¶ 27 (emphasis added). Rivera's testimony did not bear out this allegation. While Rivera testified that Martinez asked Rivera to have Salgado killed, he testified that it was members of MS-13 and sicarios, ***not including Martinez***, who shot Salgado. *See* 12/12/24 Hr'g Tr. at 29-30 (Rivera's testimony that Mr. Martinez drove with Rivera to Salgado's house, where Salgado was lying in a hammock on the front porch, but did ***not*** attack Salgado); *id.* at 30-31 (Rivera's

---

[5] Indeed, the Government has previously relied solely upon Rivera's word in bringing charges against another defendant, "Juan Carlos Bonilla Valladares, El Tigre," claiming he was also involved in the murder of Ramos—only to retract the allegation when Rivera proffered, years after the charges were filed, apparently clarifying that he was referring to a different person who went by the name "Tigre." Showing that the Government has not carefully vetted allegations made based on Rivera's word alone. *See United States v. Bonilla Valladares*, No. 15-cr-379 (PKC), ECF No. 551, at 1-2.

testimony that MS-13 sicarios later went to Salgado's house and shot Salgado, with no mention of Martinez's being present, much less shooting Salgado himself).

Rivera's explanation for Martinez's alleged motive to kill Salgado also lacks credibility or corroboration. According to Rivera, he and his brother Javier wanted Salgado to arrange for Martinez to be appointed as Honduran Minister of Security, to further the Cachiros' drug trafficking. *See* 12/12/24 Hr'g Tr. at 29:15 – 29:20; *id.* at 101:6 – 101:12. Rivera testified that, when Salgado failed to deliver that appointment, Martinez was "annoyed and angry" and wanted Salgado killed. *Id.* at 29:15 – 29:20.

But, since the *Fatico* hearing, material witnesses have come forward after seeing accounts of Rivera's testimony in the news, providing declarations refuting Martinez's supposed motive for killing Salgado. These witnesses were present at a meeting during which Salgado, a political ally of Martinez from the same political party, offered Martinez another position—one that Martinez and others in his party ***preferred*** to that of Vice Minister of Security. *See* DX 8 (Declaration of Defense Witness 1) ("At a meeting in Cayo Campo, Deputy Salgado told us that Midence Martinez would not get a position in the Ministry of Security but that we would get PRONADER instead. This made us very happy because we could help the people of Colón with projects and jobs. Deputy Juan Ramón Salgado was supposed to help us get that position, but we were greatly disappointed when he was assassinated a few days later."); DX 9 (Declaration of Defense Witness 2) "in the month of April we were summoned to the City of Tocoa for a meeting by Deputy Juan Ramón Salgado Cuevas and informed the work team of Midence Martinez that President Manuel Zelaya sent to tell us that he cannot give us the vice ministry of security but that he offers us the General Directorate of the National Rural Development Program (PRONADER). We agreed among all those present that we were in agreement to accept this proposal since it seemed to us a better

proposal than the vice ministry of security, since in this program many projects were developed to generate jobs and help the population, unfortunately weeks later Deputy Juan Ramón Salgado Cuevas died and with his death such offer was left without value and effect and this meant a loss for the department of Colon because we did not achieve the objective of supporting production through this program since Deputy Juan Ramón Salgado Cuevas was the direct link between President Manuel Zelaya and us.")  In short, because Salgado was the primary connection between Martinez and then-President Manuel Zelaya, Salgado's death actually hurt Martinez politically; it did not help him.   In light of this countervailing evidence about Martinez's lack of motive to kill Salgado, and Rivera's demonstrated willingness to lie and obfuscate throughout the *Fatico* hearing and in other cases, there simply is no basis to credit Rivera's bald assertion that Martinez found the Vice Minister of Security position worth killing for.

Moreover, still other witnesses have recently come forward to support Martinez, providing affidavits that confirm that when an individual made an attempt on Martinez's life, he did not even retaliate; he simply reported the individual to the authorities and kept the peace.  *See* DX 12 (Judgment of conviction of individual for the attempted murder of Martinez); DX 13 (Declaration of Defense Witness 3) (stating that Martinez merely reported the incident to the authorities and did not retaliate); DX 14 (Declaration of Defense Witness 4) (same).  Rivera's testimony that Martinez would arrange to kill Salgado, his political ally who was in a position to materially advance his career and help his community, because he was "annoyed and angry," is thus simply not credible.

In short, there is no basis—much less a preponderance of the evidence—on which this Court could conclude that Martinez participated in any way in the murder of Salgado. Those allegations should be struck from the PSR and disregarded by the Court.

### iii. Alleged Victim-3, Nahum Palacios, and Alleged Victim-4, his partner

Paragraph 28 of the draft PSR alleges:

> In 2009 or 2010, a Honduran journalist ("Victim-3") working in the area of Tocoa, Colon, Honduras, publicly criticized MARTINEZ TURCIOS and other Honduran officials aligned with MARTINEZ TURCIOS. Leonel Maradiaga worked with MARTINEZ TURCIOS to stem the criticism by Victim-3 by sending drug money to Victim-3 in an effort to silence him. After only a brief pause, Victim-3 resumed his negative coverage of MARTINEZ TURCIOS. MARTINEZ TURCIOS asked Leonel Maradiaga for help in murdering Victim-3. Leonel Maradiaga and MARTINEZ TURCIOS directed a group of sicarios, including some of MARTINEZ TURCIOS's brothers, to kill Victim-3. The sicarios shot at Victim-3 outside of Victim-3's house in Tocoa, Colon. Victim-3's significant other ("Victim-4") was also killed during the attack on Victim-3. MARTINEZ TURCIOS and Leonel Maradiaga subsequently paid the sicarios for their work in murdering Victim-3.

Draft PSR ¶ 28.

Although Rivera testified at the *Fatico* hearing that Martinez killed Palacios because of Palacios's repeated negative media coverage about Martinez, the Government has presented no press reports to corroborate any such alleged motive for Martinez to kill Palacios. Rivera's testimony, though evasive at first, shows that he was not even asked to provide the Government information to help locate any of the press reports that supposedly drove Martinez to murder. *See* 12/16/24 Hr'g Tr. at 108:11 – 108:25.

Since the *Fatico* hearing, Honduran witnesses have come forward who both knew Martinez and worked with Palacios and on behalf of journalists, to refute this alleged motive. *See* DX 10 and DX 11 (Declarations of Defense Witnesses 5 and 6) These witnesses report that Martinez had a good relationship with the press generally and with Palacios specifically, and thus he would have had no reason to want Palacios dead. *See* DX 10 (Declaration of Defense Witness 5); DX 11 (Declaration of Defense Witness 6).

While the Government has purported to corroborate Rivera's testimony about Palacios's death with news articles—which, as explained above, do not in fact corroborate his testimony at all—other news articles, including those introduced as defense exhibits, show that Rivera's account of Palacios's murder are inconsistent with public accounts of the murder.  For instance, Rivera testified that Ovando Martinez told him that "Nahum [Palacios] had been shot as he was entering his house." 12/12/24 Hr'g Tr. at 39:7.  But multiple news reports state that Palacios was shot *while driving*.  *See* DX 3 (Reporters Without Borders, *Third Journalist Gunned Down in Two Weeks* (Mar. 16, 2010)) at 1 ("Aged 34, Palacios was ambushed and shot in his car."); DX 4 (Tim Padgett, *Who is Killing Honduran Journalists?*, TIME (May 15, 2010)) at 2-3 ("On the night of March 14, as Palacios drove home in the city of Tocoa near the Atlantic coast, a car carrying gunmen pulled alongside his and shot him several times, killing him."); DX 5 (Thelma Mejia, *HONDURAS: Deadliest Month Ever for Reporters*, Inter Press Service (Mar. 31, 2010)) at 1 ("And on Mar. 14, Nahum Palacios was killed as he was driving home in the town of Tocoa . . . ."); *see also* Associated Press, *Honduras: Killing of TV Journalist Spawns Protest* (Mar. 15, 2010) ("Nahum Palacios, director of a TV station in Tocoa near the Caribbean coast, was shot to death Sunday night as he drove home and was intercepted by two other vehicles, said Leonel Sauceda, a spokesman for the federal police."), *available at* https://archive.ph/20240524214415/https://www.webcitation.org/5ot9GCh7W?url=http://www.google.com/hostednews/ap/article/ALeqM5j4pN90I_KYuYxWbB76B5n0VU4L_QD9EFAEF00; Committee to Protect Journalists, *Third Honduran Journalist Gunned Down in Two Weeks* (Mar. 16, 2010) ("Palacios, 34, . . . was driving home when two cars pulled alongside his vehicle at about 10:30 p.m., the local press said. At least two unidentified individuals fired several times, according

to the Honduran press."), *available at* https://cpj.org/2010/03/third-honduran-journalist-gunned-down-in-two-weeks/.

Another Honduran witness, who worked closely with Palacios, has also provided an affidavit stating that Palacios received death threats from a ***different*** person around the time he was murdered. *See* DX 11 (English Translation) at 1-2. According to this witness, the alternative suspect became angry at Palacios for reporting on a police raid of his father's house. *Id.* at 1. As this witness has reported to human-rights organizations, shortly thereafter Palacios received a death threat and was subsequently murdered. *Id.* This witness was later threatened by armed individuals who said that Palacios's killer was dead; the witness then learned that the alternative suspect had been murdered. *Id.* at 2.

There is also abundant evidence that Palacios was killed at a time when numerous journalists were being killed in Honduras, that Palacios had received multiple death threats leading up to his murder, and that other suspects, not including Martinez, were being actively investigated in connection with Palacios's murder, for reasons that had nothing to do with Martinez. Notably, the Inter-American Commission on Human Rights ("IACHR") has determined that Palacios was killed "over the expression of [his] freedom of expression in opposition to the [2009] coup d'état." IACHR, *Situation of Human Rights in Honduras* at 86 (Dec. 31, 2015), *available at* https://www.oas.org/en/iachr/reports/pdfs/honduras-en-2015.pdf. And the Committee of Relatives of Detained-Disappeared Persons in Honduras and the Center for Justice and International Law have also filed a claim with the IACHR arguing that Palacios was murdered in retaliation for his reporting on that coup. *See* DX 7 (IACHR, *Admissibility Report: Nahúm Palacios Arteaga and Yorleny Sánchez Rivas, Honduras*, *available at* https://www.oas.org/es/cidh/decisiones/2023/HNAD_1207-18_ES.PDF) (English translation) at 3 ("The petitioners allege that journalist

Nahúm Palacios Arteaga was murdered due to his media coverage and opinions against the State. Prior to his murder, Mr. Palacios would have been the victim of death threats, abuses of authority, illegal detention and harassment carried out by state officials, which is why Mr. Palacios had precautionary measures issued by the IACHR, which were never carried out effectively by the State.").[6]

The IACHR's report finding those allegations admissible (and thus subject to further adjudication by the Commission, in a proceeding that is still pending) states that, less than a year before his murder, Palacios had "received death threats from the then commander of the Puerto Castilla naval base, Captain 'HMT,'" if he did not stop his reporting about the coup. *Id.* at 3. According to the report, when Palacios refused that demand, soldiers destroyed his transmission equipment, arrested several of his colleagues and questioned them about Palacios's whereabouts, and ultimately detained Palacios and threatened him, including with rifle fire, before releasing him with instructions to "speak[] in favor of the de facto president and the army." *Id.* at 3-4. As a result of these events, Palacios requested, and received, an order from the IACHR that Honduras should "adopt protection measures in favor of Mr. Palacios to guarantee his life and integrity"—but the state never implemented any such protections. *Id.* at 4. Notably, although the Government in this proceeding has not produced any forensic evidence about the murder of Palacios, the UNHCR admissibility report cites a plethora of evidence—including an exhumation and autopsy and sworn

---

[6] Martinez was a member of the same political party as Honduran President Jose Manuel Zelaya Rosales ("Zelaya"), who was deposed in the coup; and he remained neutral during this coup. Martinez would have had no reason to take part in any action against Palacios for speaking out against the coup. *See* PSR ¶ 35 (Martinez was a member of the Liberal Party); European Parliament, *HONDURAS: Political Parties and Elections* (showing Zelaya as member of Liberal Party),                          *available                          at* https://www.europarl.europa.eu/meetdocs/2004_2009/documents/fd/200/200601/20060125_hon duras_elec.pdf.

testimony from numerous witnesses, *id.* at 6—which could have been investigated before accusing Martinez of involvement in Palacios's murder based on Rivera's word alone.

The details to which Rivera testified before this Court also conflict with his sworn testimony in at least one of the cases upon which the Government relied to bolster Rivera's credibility, *United States v. Fuentes Ramirez*, No. 15 Cr. 379 (PKC) (S.D.N.Y.).  During the *Fatico* hearing before this Court, Rivera testified that Ovando Martinez told him over the phone that both Palacios and his wife had been shot:

> Q.     Did the defendant's brother Ovando explain how anyone else was injured or killed?...
>
> A.     Yes, sir.
>
> Q.     Who else was killed or shot?
>
> A.     Nahum's wife was shot at.

12/12/24 Hr'g Tr. at 39:5-14.  But, at the 2021 trial of Geovanny Fuentes Ramirez, Rivera testified that he was only told by his *sicarios* that Palacios had been killed; and he did not learn until later that Palacios's partner had also been shot.  *See Fuentes Ramirez*, No. 15 Cr. 379 (S.D.N.Y.), ECF No. 296, at 445:11 – 445:15 ("Q. When the *sicarios* reported back to you that they had killed Mr. Palacios, they didn't tell you that they also killed his girlfriend?  A. I just remember that they killed Mr. Palacios, sir, that's what they told me, sir."); *id*. at 446:16-18 ("I accept responsibility for Nahum's murder, sir, but in terms of third parties who might have been injured or hurt, I do not remember them, sir."); See also *Fuentes Ramirez*, No. 15 Cr. 379 (S.D.N.Y.), ECF No. 300 at 18-25 ("Q. Now, at the time of Mr. Palacios' murder, did you know that Ms. Sanchez had been killed?  A. I did not know, sir.")  Rivera's sworn testimony in 2021 is thus materially inconsistent with his sworn testimony before this Court, and defies credibility that he would recall a specific

conversation with Ovando Martinez in 2024, more than three years after he recalled having no memory of learning that anyone else besides Palacios was shot that day.

In sum, the Government has produced no evidence to corroborate Martinez's supposed motive to kill Palacios, and witnesses from Honduras, including witnesses who knew Palacios and his relationship with Martinez and have interests to protect the community of journalists in Honduras, have rebutted Rivera's testimony. Moreover, Rivera's testimony about how Palacios died is inconsistent with media accounts of Palacios's death, and Rivera's sworn statements about his knowledge of Palacios's partner's death are inconsistent with his own prior sworn testimony at the *Fuentes Ramirez* trial. Because Rivera's testimony is neither corroborated nor credible, the Government has failed to meet its burden of offering reliable evidence to show by a preponderance of the evidence that Martinez had any involvement in Palacios's death.

### iv. Alleged Victim-5, "Mantequilla"

Paragraph 29 of the draft PSR alleges as follows regarding "Mantequilla":

> Sometime after the murder of Victim-3 and Victim-4, MARTINEZ TURCIOS was at a car wash in Honduras, when he called Leonel Maradiaga to say that he had seen one of Victim-1's workers ('Victim-5') at that location. Leonel Maradiaga told MARTINEZ TURCIOS to kidnap Victim-5 and transport Victim-5 to Colon. MARTINEZ TURCIOS and his brothers kidnapped and transported Victim-5 to Colon, where Leonel Maradiaga and MARTINEZ TURCIOS interrogated Victim-5 regarding how many of Victim-1's men remained alive. During this interrogation, MARTINEZ TURCIOS tortured Victim-5 by connecting a device to Victim-5's fingers that painfully twisted his fingers. MARTINEZ TURCIOS's brother, Warren Martinez Turcios, also shot Victim-5 in the foot. Thereafter, MARTINEZ TURCIOS and others, including the defendant's brother, Ovando (or Obando) Martinez Turcios, shot and killed Victim-5. Victim-5's body was later buried at a location near where he was murdered. A few days later, Victim-5's body was dug up and thrown in a nearby river.

Draft PSR ¶ 29.

Rivera's testimony at the *Fatico* hearing did not bear out any of these allegations. At the *Fatico* hearing, Rivera stated that he could not recall whether it was Midence Martinez or his brother Ovando who called Rivera to tell him that Mantequilla was at the car wash. *See, e.g.*, 12/12/24 Hr'g Tr. at 44:7 – 44:14 (Rivera testifying, "I don't remember if it was my cousin Midence or my cousin Ovando, sir," who called to tell him about Mantequilla's whereabouts).

Rivera also testified—contrary to the draft PSR—that Midence Martinez was ***present***, but he ***did not*** torture or shoot Mantequilla; instead, according to Rivera, it was Ovando Martinez who tortured and shot Mantequilla by putting a rope around his neck. *Id.* at 45:19 – 46:1; *id.* at 46:2 – 46:10.

Rivera's account at the *Fatico* hearing of the reason for Mantequilla's alleged kidnapping, torture, and murder is also at odds with his sworn testimony at the *Fuentes Ramirez* trial. *Compare* 12/12/24 Hr'g Tr. at 45:3 – 45:5 (Rivera's testimony that he wanted Mantequilla killed "[b]ecause he was a hit man of the enemy who had killed my brother") *with Fuentes Ramirez*, No. 15-cr-379 (S.D.N.Y.), ECF No. 290, at 483:7 – 483:12 (Rivera's testimony that he wanted Mantequilla killed because he had "killed a friend of [Rivera's]").

Rivera also testified that Mantequilla's body was disposed of in a different way than that alleged in the draft PSR. *See* 12/12/24 Hr'g Tr. at 46:11 – 46:13 (Rivera's testimony that Mantequilla's body was thrown into the river after he was shot, in contrast to the draft PSR claiming that Mantequilla was first buried and then his body dug up and put in the river).

In sum, Rivera's testimony was entirely inconsistent both with the allegations in the draft PSR and with his own prior sworn testimony. The allegations in the draft PSR should thus be wholly disregarded, and Rivera's testimony at the *Fatico* hearing, which ascribes an entirely different role to Martinez than that alleged in the draft PSR, should be disregarded because it is

uncorroborated and not credible. *See United States v. Autuori*, 212 F.3d 105, 120-21 (2d Cir. 2000)

(a witness's testimony cannot carry a party's burden where it is "riddled with inconsistency" and

"contradicted by other . . . witnesses"); *United States v. Jordano*, 521 F.2d 695, 698 (2d Cir. 1975)

(where "a party's case may stand or fall on . . . one witness, his credibility is subject to close

scrutiny").

### v.  Alleged Victim-6, Salvador Regalado

Paragraph 30 of the draft PSR alleges, concerning the murder of Salvador Regalado

("Victim-6"), as follows:

> In 2011, a drug trafficker allied ('CC-1') with Leonel Maradiaga asked him
> to kill a *Cachiros* worker ('Victim-6') because CC-1 believed Victim-6 had
> murdered one of his workers. ***Leonel and Javier Maradiaga and
> MARTINEZ TURCIOS agreed to have Victim-6 killed because they
> viewed Victim-6 as a liability to the* Cachiros*. They later lured Victim-6
> to a nightclub in San Pedro Sula, Cortes, Honduras, where MARTINEZ
> TURCIOS, Javier Maradiaga, and others shot and killed Victim-6.***

Draft PSR ¶ 30 (emphasis added).

Notably, the draft PSR ***does not*** allege that Martinez shot at Regalado's bodyguards.

Nonetheless, during the first day of the *Fatico* hearing, Rivera asserted for the first time that

Martinez also had shot at one or more of those bodyguards.  12/12/24 Hr'g Tr. at 36:8 – 36:14

(testifying that Regalado's bodyguard was shot by "[t]he bodyguards who were there, myself, Eliel

Sierra, and my cousin Midence").  But then, on the second day of the *Fatico* hearing, Rivera

testified that Martinez ***did not*** shoot at the bodyguards.  12/16/24 Hr'g Tr. at 128:2 – 128:7.  In

light of this materially inconsistent testimony, under oath and three days apart, and numerous other

issues with Rivera's credibility, none of Rivera's testimony about Regalado, or anything else,

should be credited.  *Autuori*, 212 F.3d at 120-21; *Jordano*, 521 F.2d at 698.

### vi. Alleged Victim-7, "Alex"

The Government alleges in paragraph 31 of the draft PSR, concerning the murder of an individual known only as "Alex" ("Victim-7"), as follows:

> In 2012 or 2013, one of Leonel Maradiaga's cousins was killed. In response, Leonel Maradiaga, MARTINEZ TURCIOS, MARTINEZ TURCIOS's brothers, and some sicarios traveled to locate and kill the individual ('Victim-7') responsible for Leonel's cousin's murder. When they arrived at Victim-7's home, MARTINEZ TURCIOS and the sicarios went into the home and removed Victim-7. Victim-7 was then transported to Tocoa, Colon. Once there, MARTINEZ TURCIOS tortured Victim-7 by pricking Victim-7's finger with safety pins and putting a rope around Victim-7's neck and twisting it, while Victim-7 was being interrogated regarding the reason for having murdered Leonel's cousin. Leonel Maradiaga then shot and killed Victim-7.

Draft PSR ¶ 31.

Although there was no allegation in the draft PSR, that Martinez shot Alex, at the *Fatico* hearing Rivera suddenly claimed that Martinez and others *had* shot Alex.  12/12/24 Hr'g Tr. at 42:22 – 43:6 (testifying that Alex was shot by Martinez, Rivera, and his cousin Carlos's sons). Because the shooting was not even alleged in the draft PSR, and Martinez was not put on notice of it, it should be disregarded.  Moreover, the inconsistencies between the draft PSR and Rivera's testimony show that Rivera's allegations have been entirely unvetted by the Government, and they should be disregarded for that reason as well.

Rivera's inconsistencies, as well as the material inconsistencies between the draft PSR and the conduct alleged at the hearing, render his testimony unworthy of belief.  *See Autuori*, 212 F.3d at 120-21; *Jordano*, 521 F.2d at 698.  Accordingly, paragraph 31 should be struck from the PSR.

      c.   **The previous proceedings in which Rivera testified, and upon which the Government relies, do not add weight to Rivera's testimony before this Court, and in fact undercut his credibility**

The fact that other courts or juries have credited Rivera's testimony in other proceedings—where, in contrast to this case, there were incriminatory recordings about the specific conduct alleged,[7] other witnesses, or admissions by the defendants—does not add weight to Rivera's uncorroborated, contradictory, and non-credible testimony here. *See, e.g.*, *United States v. Fuentes Ramirez*, No. 15 Cr. 379 (S.D.N.Y.), ECF No. 308, at 1124:2 – 1124:10 (Government arguing, in rebuttal summation, "Defense counsel told you that the only evidence in this case is witnesses—Leonel Rivera—and that is dead wrong. Here is all the other evidence you have: You have the defendant's phones. I've already talked about the guns. You saw scores and scores of pictures. Did you see a license for every one? Not just guns, machine guns, customizable weapons, extended magazines to fire more bullets faster, a laundry list of police, military, and politicians on his phone, probably just friends he was calling to catch up with"); *id.* at 1127:2 – 1128:14 (Government arguing, in rebuttal summation, "Think about how [Rivera's] testimony is corroborated by the other evidence in this case. His story matches up with Jose Sanchez's.  . . . Leonel Rivera is also corroborated by the defendant's own statements in his postarrest interview"); *id.*, ECF No. 353, at 10-11 (finding that "[t]he testimony of Rivera was supported by other evidence introduced at trial," including defendant's admissions, testimony of other witnesses, and contents of defendant's cell phone); *United States v. Lobo*, No. 15 Cr. 174 (S.D.N.Y.), ECF No. 211, at 3-5 (finding Rivera "credible in light of the entirety of the record," including Lobo's admissions and a recording in

---

[7] As another court has found, the video in which Martinez appears does not even discuss drug trafficking, much less Martinez's involvement in violence.  *See United States v. Najera*, 2022 WL 2802703, at *11 (S.D.N.Y. July 15, 2022) (Gardephe, J.) ("Moreover, the transcript of the meeting makes no reference to drug trafficking activity.").

which Lobo discussed providing security for drug shipments "just like the previous times"); *United States v. Hernandez Alvarado*, No. 15 Cr. 379 (S.D.N.Y.), ECF No. 113, at 1194:20 – 1195:10 (Government arguing, in rebuttal summation, "So defense counsel is asking you to believe that these five witnesses arrested across four years in  different places all just happened to come up with the idea to tell the government that the defendant was a massive cocaine trafficker operating a state-sponsored cocaine business, and then even more of a coincidence, none of those men were extradited or investigated or charged by Juan Orlando's administration. That's a pretty big coincidence that doesn't look very good for the defendant"); *United States v. Hernandez*, No. 15 Cr. 379 (S.D.N.Y.), ECF No. 758, at 1677:3 – 1679:21 (Government arguing, in summation, "You don't have to approve of what Leonel Rivera did. You just have to decide whether he's telling the truth. And when you look at all the other evidence, you will find that he is backed up. Here is how you know. Jose Sanchez, an accountant, and Leonel Rivera, a massive drug trafficker, said the same things on important details. . . . .").  Because here, in contrast to other proceedings, the Government has not offered any other witnesses or documents to corroborate Rivera's testimony, we respectfully urge the Court not to rely on Rivera's testimony in other proceedings, but rather to sentence Martinez based solely on the evidence—or lack thereof—before the Court in this matter.

In any event, as noted above, Rivera's testimony about Palacios and Mantequilla in *Fuentes Ramirez* materially conflicts with testimony he provided to this Court during the *Fatico* hearing. Further, at Fabio Lobo's *Fatico* hearing, Rivera provided a detailed anecdote under oath, testifying that Lobo asked to visit an airstrip with Rivera "to feel the adrenaline" of receiving a plane with drugs, but Rivera "said to him, Look, commander, that's dangerous because if a plane is being followed by military then you know they start shooting and with us being down there it's

dangerous," and they did not go to the airstrip.  *See* 3501-87 at 43-44 (transcript of testimony in Lobo Fatico hearing, during which Government alleges Rivera was credible.)  Yet at Martinez's *Fatico* hearing, Rivera testified that he went to airstrips with Lobo.  See, 12/12/24 at 97 23:25 ("Q. Did you and Mr. Lobo ever go to airstrips together to unload drugs from planes?  A. Yes, Counselor.")  The material inconsistencies between Rivera's testimony at Martinez's *Fatico* hearing and his sworn statements in the other proceedings, upon which the Government relies, thus do not bolster Rivera's credibility—they undercut it.

### III.     The Undisputed and Disputed Facts Related to Drug Trafficking

As he did during his plea, Martinez takes full responsibility for his role in facilitating the pervasive culture of corruption and drug trafficking in Honduras, which fueled a substantial influx of drugs into the United States during the time of the charged conspiracy.

Martinez, who is a distant cousin of Rivera and Javier, spent his early career in the Honduran military and rose to the rank of lieutenant.  Martinez became interested in politics while working for his family business, after retiring from the military in 1996. When the Riveras approached him and offered financial support for his political career, Martinez was aware that they were involved in large-scale drug trafficking, carried weapons, and had a reputation for being ruthless. He was also aware that they wanted to use his name, and any political position he obtained, to their own advantage.  Further, he was aware that the Riveras had placed his name on one of several of their companies to lend the company an air of legitimacy.

Martinez also knew, when he accepted the Riveras' money for his political campaigns, that there would likely come a day when they would expect political favors.  The fact of the matter is, however, that Martinez was never a member of the party in power, and never ascended to a position of power where he could do political favors for the Riveras. *See* 12/12/24 Hr'g Tr., ECF No. 45,

at 95:15 – 95:19 (Rivera's testimony that Martinez's party was never in power while Martinez served in Congress); *id.* at 20:18 – 21:5 (Rivera's testimony that he bribed officials of both major Honduran political parties). Retired from the military for nearly a decade by the time of the conspiracy, Martinez—who had never been a senior officer—simply did not have the power, influence, or current information that many of the politicians and military officials on Rivera's payroll did to protect drug shipments and facilitate money laundering. Those individuals included former Honduran President Pepe Lobo, his son Fabio Lobo, former Honduran President Juan Orlando Hernandez, high-ranking military generals, and others. *See id.* at 96:2 – 97:22 (Rivera's testimony that he bribed Pepe Lobo and Fabio Lobo for, *inter alia*, access to military generals, military weapons, government information, and vehicles with presidential license plates); *id.* at 61:13 – 61:18 (Rivera's testimony that he and Javier supported President Juan Orlando Hernandez's political campaigns).

While Martinez disputes many aspects of Rivera's testimony, his guilty plea reflects that he agreed to take money from the Riveras for his congressional campaigns, knowing that it carried an implicit promise to help the Riveras politically if and when the time came, and he was aware when he did so that the Riveras were trafficking large-scale quantities of cocaine that would make their way to the United States, including through the use of airplanes. The guilty plea Martinez entered, and the enhancements to which he agreed, reflect this role and his knowledge of the Riveras' drug trafficking and carrying of firearms, which was well known and Martinez does not dispute.

Nonetheless, Rivera's accounts of Martinez's role in coordinating security for drug shipments are uncorroborated and lack credibility, and Martinez disputes Rivera's allegations. For instance, Rivera testified that Martinez used a vehicle with a Congressional license plate to help

24

transport drugs.  But a witness who worked with Martinez while he was in Congress, Defense Witness 7, has come forward to refute that allegation, stating that Martinez "never had any vehicle assigned to him by the National Congress of Honduras, nor did he have any vehicle license plate assigned to him by the National Congress of Honduras, we always traveled in vehicles owned by Midence Martinez with the corresponding license plates for these vehicles."  DX 15.

Rivera's allegation that Martinez wore his military uniform to help transport drugs, when he had been retired from the military for over a decade at the time Rivera alleged he was assisting in transporting drugs, also defies credulity, since the Riveras bribed and had access to the highest-ranking generals in the current administration to facilitate their drug trafficking.  Rivera's testimony about Martinez's hands-on role in transporting drugs and coordinating drug shipments, which is as illogical as it is uncorroborated, thus should not be credited.

### IV.    Conclusion

The Government's allegations of violence and an organizational role in drug-trafficking activity against Martinez have no credible support, because the only evidence the Government has offered is the untrustworthy testimony of Leonel Rivera, which is contradicted by his own testimony at the *Fatico* hearing itself and in other proceedings, as well as by Honduran witnesses with personal knowledge of the events at issue.  Certainly, the Government has not proven those allegations by a preponderance of the evidence.

Accordingly, paragraphs 24 through 31 of the draft PSR should be struck, and the Court should not consider the Government's allegations of violence or an organizational role in coordinating drug shipments or transporting drugs in imposing a sentence on Martinez.

January 13, 2025                         Respectfully submitted,


                                        /s/ Kristen M. Santillo
                                        GELBER & SANTILLO PLLC
                                        Kristen M. Santillo
                                        Sarah A. Sulkowski
                                        52 Duane Street, 7th Floor
                                        New York, NY 10007
                                        Tel: (212) 227-4743
                                        ksantillo@gelbersantillo.com
                                        *Counsel for Midence Oqueli Martinez Turcios*